IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**DAVID V. BENYAK**         )
                                )
       Plaintiff,            )
                                )
       v.                    )     2:13cv770
                                )     Electronic Filing
**CAROLYN W. COLVIN,[1] ACTING**   )
**COMMISSIONER OF SOCIAL**       )
**SECURITY,**                    )
                                )
       Defendant.         )

## OPINION

### I.    INTRODUCTION

Plaintiff commenced this action seeking review of the decision of the Commissioner of

Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits

("DIB") under Title II of the Social Security Act ("Act"). The record was developed at the

administrative level and the parties have filed cross motions for summary judgment. For the

reasons set forth below, plaintiff's motion for summary judgment will be granted to the extent it

seeks to have the decision below vacated and the matter remanded for further proceedings, the

Commissioner's motion for summary judgment will be denied and final judgment will be entered

in favor of plaintiff and against the Commissioner.

### II.    STATEMENT OF THE CASE

### A.    Procedural History

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, succeeding former Commissioner Michael J. Astrue. Social Security History-Social Security Commissioners, http://www.ssa.gov/history/commissioners.html (as visited on August 13, 2013). Consequently, Acting Commissioner Colvin is now the official-capacity defendant in this action. *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); FED. R. CIV. P. 25(d).

Plaintiff filed an application for disability benefits on September 20, 2010, alleging disability since June 15, 2010.  R. 118.  The application was denied on November 17, 2010.  <u>Id</u>. A hearing was held before an ALJ on October 6, 2011.  R. 21-53.  Plaintiff, plaintiff's friend Kelly Knot, and a vocational expert (VE) testified.  <u>Id</u>.  The ALJ rendered a decision on January 11, 2012 denying plaintiff's application.  R. 7-9.  On April 19, 2013, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final ruling of the Commissioner. R. 1-5.  This civil action followed.

**B.      General Background**

Plaintiff was born on November 17, 1965, and was 44 years of age on June 15, 2010.  R. 26.  He had an eleventh grade education and had not received a GED.  R. 29.  Plaintiff is divorced and lives with his two daughters and girlfriend, Kelly Knot.  R. 27.  Plaintiff had a 10 year work history as a machine shop grinder and a cut-off saw operator in a family/self-owned business.  Plaintiff ceased work and began leasing this business in 2006.  R. 29-30.  Plaintiff had not worked since 2006 and supported himself by leasing the building and selling the equipment in the machine shop.  <u>Id</u>.  Plaintiff had sufficient earnings to maintain an insured status through December 31, 2010.  Consequently, to be entitled to DIB plaintiff had to establish that he became disabled on or before that date.  *See* 42 U.S.C. § 414(a).

Plaintiff's work in the machine shop required him to lift 25-40 pounds, cut steel, perform light grinding and do some paperwork.  R. 30-31.  This work was medium and semi-skilled in exertional/task level.  R. 45-46.  Plaintiff indicated he was no longer able to do the tasks necessary to perform this work.  R. 31.

Plaintiff indicated his onset date was June 15, 2010 because he fell and injured himself. R. 26.  Plaintiff did not seek immediate medical attention after the fall.

Plaintiff generally can perform the activities of daily living such as bathing and dressing himself, although it takes him longer because of pain.  R. 31.  He takes pain medication on a daily basis and when his pain increases he also uses a hot massage pad and hot baths.  Id.  He shifts from sitting, standing and walking at various intervals as well.  Id.  He watches television, reads the newspaper and does the family bills.  Id.

Plaintiff can drive and travel in a car, but he does these things only when necessary.  R. 147.  He talks on the telephone and visits with friends that stop by occasionally.  R. 148.

**C.    Medical Evidence**

**1.  Physician and Medical History**

 On February 16, 2010, plaintiff sought follow-up treatment with his primary care physician, Joseph DiCroce, M.D., after suffering a fall on ice approximately six weeks earlier.  R. 204.  Plaintiff complained of pain in sacral region of his spine and indicated he was "staying off of it" to cope with the pain.  Id.  Dr. DiCroce's impression was a "sacral fracture" and he continued plaintiff on Vicodin for pain and Flexeril for a muscle relaxer.  R. 204, 199.[2]

On August 17, 2010, plaintiff first sought medical treatment with Dr. DiCroce following the fall on June 15, 2010.  Plaintiff again presented with complaints of pain associated with a sprain or fracture in the sacral region.  R. 203.  Neurological testing revealed he could not dorsiflex his right foot and had developed an ongoing right foot drop.  Id.  Dr. DiCroce indicated plaintiff had a right foot drop, hyperlipidemia and COPD.  Id.  He continued plaintiff on his medications for pain management. [3]  Id. at 203, 199.  Dr. DiCroce also referred plaintiff for a

---

[2] Plaintiff also had a long-standing history of suffering from chronic obstructive pulmonary disease ("COPD") which dated back to at least October of 2002.  R. 207; *see also* R. 205 (documenting existence of COPD impairment in 2007).
[3] Dr. DicCroce prescribed Vicodin to be taken 4 times daily for pain and Flexeril twice daily to relieve muscle spasms.  R. 199.

battery of testing from specialists regarding his back pain and right foot drop. R. 193, 208, 183.

On August 23, 2010, plaintiff underwent a magnetic resonance image ("MRI") conducted by Dr. Ramsey, M.D. R. 193. The testing revealed the following:

1. Disc herniations are present at L3-L4 and also at L4-L5.
2. At L3-L4, there is a mild to moderate focal central spinal stenosis. There is a mild posterocentral herniated nucleus pulposus at this level. There is mild bilateral lateral recess stenosis.
3. At L4-L5, there is a moderate to marked focal central spinal stenosis. There is a broad-based disc herniation at L4-L5. There is bilateral recess stenosis at the L4-L5 level.
4. At L5-S1, there is left lateral recess stenosis.

R. 194.

On September 02, 2010, an electrodiagnostic evaluation was performed by Dr. Arthur T. Androkites, M.D., to investigate plaintiff's continued reports of pain, loss of feeling in the right foot, and right leg numbness among other symptoms. R. 208. Plaintiff presented with a history of constant right knee pain, numbness and tingling in the right foot, right leg weakness, right extremity weakness and lower back pain. Id. These symptoms had been present for a considerable period of time, and arose at night as well. Id. They were worsened by walking, sitting and standing. Id. Dr. Androkites concluded that a "systemic review" was "positive for [these limitations]." Id.

Plaintiff presented with atrophy in the right tibialis anterior. R. 209. Reduced motor strength was revealed in the right tibialis, tibialis posterior, extensor halluces longus, and peronei. Id. Straight leg maneuvering was negative bilaterally. Id.

Dr. Androkites reported that the electrophysiological study was "abnormal." Id. Plaintiff's right common peroneal motion response was only 20% of the normal response on the left side. Id. While the right superficial peroneal sensory response was of normal amplitude, the EMG needle examination demonstrated the following:

4

> Chronic neurogenic changes involving right tibialis anterior, right peroneus muscles. There was sparing of right flexor digitorum longus, right biceps short head, and right lumbosacral paraspinal muscles. Left tibialis anticus was spared as well. This abnormal electrophysiological study is suggestive of right L5 radiculopathy of chronic duration. However, a more distal entrapment involving the sciatic nerve or peroneal nerve is also possible. In any event, this appears to be a lower motor neuron pathology. Correlation with lumbosacral MRI is recommended to rule out L5 or L4 nerve root entrapment.

Id.

On September 20, 2010, plaintiff was seen by Dr. David S. Zorub, M.D., Chief of Neurological Surgery at UPMC Shadyside Hospital. R. 183. Plaintiff presented with weakness in the right foot with associated numbness which was made worse with activity. Id. Motor examination revealed gross atrophy of the right perinea and foreleg with complete foot drop on the right. Id. Plaintiff also had plantar extensor weakness and could not walk on his toe or heel on the right foot. Id. There was sensory loss over the dorsum of the right foot as well as the outer aspect of the foot. Straight leg raising maneuvers were negative. Id. Plaintiff was able to perform flexion and extensions without restriction. Id.

Dr. Zorub observed that the electrodiagnostic studies confirmed an L5 radiculopathy and an MRI documented spinal canal stenosis with a broad-based disc herniation and bilateral recess stenosis at L4-L5 as well as stenosis at L3-L4 and L5-S1. Id. Dr. Zorub recommended that plaintiff undergo flexion and extension views of his lumbar spine and surgical management as soon as possible. Id.

On September 23, 2010, plaintiff underwent flexion and extension x-rays of his lumbar spine at Westmoreland Hospital. R. 215. Dr. Todd A Hrbek, M.D., concluded that the results of the x-ray revealed a normal lumbosacral spine. Id.

On November 2, 2010, plaintiff underwent a pre-surgery consultation with Lisa Kolonich, a certified physician's assistant to Dr. Zorub. R. 212-14. Plaintiff mentioned that he had re-

injured his back due to a fall in February of 2010, and he suffers from constant low back pain and numbness of the right foot.  Id.  Ms. Kolonich was only able to obtain a limited exam of plaintiff's back and legs due to his level of pain.  Id.  Plaintiff did appear to have at least a partial right footdrop.  Ms. Kolonich reported that plaintiff's strength was symmetric in his lower extremities.  Id.  Plaintiff's medical status was otherwise unremarkable.  Id.

After considering the risks attendant with surgical intervention, plaintiff decided not to pursue back surgery as a treatment option.  R. 33-34, 183.  In October, 2011, Dr. DiCroce prescribed a brace to assist with symptoms associated with plaintiff's foot drop.  R. 227-28.

Plaintiff was seen by chiropractor Mark Abbott on October 3, 2011, at the request of plaintiff's counsel.  R. 32, 218-25.  Dr. Abbott noted that plaintiff's chronic low back dysfunction dated back to a horse-back riding accident when plaintiff was 16.  R. 218.  He was in Jeannette hospital for a week and wore a back brace for 6 months.  Id.  Following an examination, Dr. Abbott reported that plaintiff suffers from a lumbar disc disorder and in his opinion plaintiff would continue to experience future pain and suffering as a result of his condition.  R. 219.  Dr. Abbott concluded that plaintiff had a 50% partial permanent disability of the lumbar spine and that he could no longer engage in substantial gainful activity.  R. 220.

Dr. Abbott also completed a physical capacities evaluation.  R. 221-25.  He concluded that plaintiff could sit two hours, stand one hour, walk one hour and drive two hours in an eight hour work day.  Id.  He would be able to lift up to 10 pounds frequently and occasionally lift 11-20 pounds.  Id.  Plaintiff could occasionally bend and reach above shoulder level, but was unable to squat, crawl or climb.  Id.  In the lumbar region, plaintiff had only a 10 degree lateral flexion on his right and left side that would limit his movement.  Id.

As previously noted, the hearing was held before the ALJ on October 6, 2011, and the

ALJ rendered his decision on January 11, 2012. Plaintiff appealed the adverse decision and thereafter provided the Appeals Council with an additional submission of medical information that had not been considered by the ALJ.

Plaintiff submitted to the Appeals Council an assessment of his medical condition completed by Dr. DiCroce on March 21, 2012. R. 230. Dr. DiCroce indicated that plaintiff suffered from "a right foot drop which causes him to become off balance at times and fall, along with the decreased range of motion and increased pain from spinal stenos and herniated disc disease." Id. In his opinion it would be difficult for [plaintiff] to work where he has to walk more than six feet or lift and carry heavy objects". Id. Dr. DiCroce also highlighted plaintiff's inability to sit for more than 2-3 hours and stiffness and numbness from his spinal stenosis and herniated disc. Id. [4]

After consideration of the record, the ALJ determined that on the date last insured plaintiff could perform sedentary work with the following restrictions:

> He is limited to occasional lifting and carrying up to 10 pounds and frequent lifting of only two to three pounds on a regular basis; is limited to standing and walking for two hours in an eight-hour work day; is able to sit for six hours in an eight-hour work day; must be afforded the option to sit or stand every 15 minutes; is limited to holding one position for 15 minutes; is limited in the use of his lower extremities for operation of foot controls; is limited to occasional balancing, using ramps, and climbing stairs; is precluded from climbing ladders, ropes or scaffolds; and must avoid exposure to all hazards such as machinery and heights due to medication use.

R. 13. The VE identified the positions of waxer, assembler, and surveillance system monitor as jobs such an individual could perform.[5] R. 49-51.

---

[4] The letter also referenced plaintiff's shortness of breath which could "cause him great harm to the point of hospitalization." In Dr. DiCroce's professional opinion, plaintiff also was "incapable of working due to the severe shortness of breath brought on by the COPD." Id.
[5] The VE indicated that although a sit-stand option is not addressed in the DOT, his identification of these jobs as including that option was based on his experience. R. 49-51.

In rendering this RFCA, the ALJ determined that plaintiff's medical determinable impairments of right leg atrophy, herniated disc, chronic back pain, ruptured disc, degenerative disc disease, detached nerves and right foot drop could reasonably be expected to cause the symptoms alleged by plaintiff. R. 14. Nevertheless, he found that plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms "were not credible to the extent they [were] inconsistent with the above [RFCA]". Id.

The ALJ reviewed the findings of Dr. Zorub, which included gross atrophy of the right perinea and foreleg "with complete foot drop on the right," plantar extensor weakness, the inability to toe or heel walk, sensory loss over the dorsum of the foot and outer aspect of the foot, and the absence of ankle jerks. Those findings also reflected the L-5 radiculopathy, spinal canal stenosis with broad based disc herniation, bilateral recess stenosis at the L3-L4 level, and stenosis at the L4-L5 and L5-S1 level.

In contrast to these findings, the ALJ highlighted the "preoperative evaluation" performed by Dr. Zorub's physician's assistant, which indicated plaintiff "only allowed limited examination of his back and legs as he alleged pain," the incompleteness of the straight leg testing, the lack of ankle edema or calf tenderness, intact and equal pulses, "at least a partial right foot drop," symmetrical strength in the lower extremities and the lack of reflexes at the knees and ankles "which may have been due to the claimant's cooperation factor." R. 14.

After reviewing plaintiff's reports of daily living and social activities, the ALJ further observed that plaintiff failed to report any side effects from his medication and there had not been any frequent changes in those medications or dosage adjustments due to side effects or ineffectiveness. The ALJ emphasized that plaintiff had elected to forgo back surgery and had not been prescribed other more aggressive treatments for pain management, such as a Tens unit,

back brace, or cane.  He had not been to a pain management clinic or undergone physical therapy.  He had not been frequently hospitalized or sought treatment at the emergency room for pain.

The ALJ considered the report of Dr. Abbott.  He discounted his opinion of disability on the grounds that Dr. Abbott was not an acceptable medical source and plaintiff's (1) election to forego back surgery, (2) lack of hospitalizations, and (3) history of treatment, all of which the ALJ deemed to be sufficient to supply other evidence "inconsistent" with Dr. Abbott's opinions and assessments.

Finally, the ALJ reasoned that plaintiff's subjective complaints "were not fully credible and consistent with his activities of daily living, medical history including infrequent and inconsistent treatment, his medication regimen, his work and earnings history and the other evidence of record."  R. 15.  Based on this assessment, the ALJ discounted plaintiff's account of the intensity, burden and limited effects of plaintiff's symptoms as "not entirely credible and [] consistent with the totality of the evidence."  Id.

In making the above assessment, the ALJ recognized that the record did not contain opinions or assessments from any state agency medical consultant.  Id.  He nevertheless assessed the medical and other evidence, assessed plaintiff's RFC as indicated above and determined that plaintiff was capable of performing substantial gainful activity.

Plaintiff contends that the record contained only consistent medical evidence supporting his application and there was no contrary medical evidence to counter the same.  Further, the ALJ erred by failing to find plaintiff disabled in accordance with Listing of Impairments 11.08 and in making adverse credibility findings against plaintiff and Kelly Knot.  Error also occurred when the ALJ failed to evaluate properly plaintiff's subjective complaints of pain and rendered a

9

RFCA that was not based on the medical evidence of record and plaintiff's consistent accounts of his limitations. The government contends that the information of record (including a number of unremarkable findings upon examination, the lack of additional and/or more aggressive forms of pain management treatment, and the RFCA at less than the full sedentary level) provide substantial evidence to support the ALJ's findings and assessments.

### III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of*

*Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the

claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the court's review is limited to the four corners of the ALJ's decision.

## III. DISCUSSION

Plaintiff's contention that the ALJ committed error at step three of the sequential process is unavailing. To be found presumptively disabled, a claimant must show that all of the criteria for a listing have been met. 20 C.F.R. §§ 404.1525(a), 416.925(c)(3).

It is always the burden of the claimant to present evidence that an impairment or combination of impairments meets or equals a listed impairment by presenting medical findings equal in severity to all of the criteria for a listed impairment. 20 C.F.R. §§ 404.1526, 416.926.

12

To meet this burden a claimant must show that his impairment meets or equals all of the requirements of a listing; a showing that it meets some or even most of them is insufficient. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The ALJ is not required to use particular language or adhere to a particular format in conducting his analysis, but must merely ensure that there is sufficient explanation to provide meaningful review of the step three determination. *Jones*, 364 F.3d at 505.

Here, Listing 11.08 addresses spinal cord or nerve root lesions with disorganization of motor function as outlined in Section 11.04B. 20 C.F.R. pt. 404, subpt. P, app. 1 at § 11.08. Section 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." The record unequivocally demonstrates that plaintiff has disorganization of motor function only in his right leg, and thus he cannot meet the requirements for disability at step three, no matter how severe the disorganization of gait or station. *Zebley*, 493 U.S. at 530.

The remaining arguments raised by plaintiff all relate, in one way or another, to the ALJ's RFCA and the corresponding hypothetical questions submitted to the VE. The record demonstrates that the ALJ's formulation of plaintiff's RFC went well beyond what the record will support under the controlling standards and thus the ALJ's decision was not supported by substantial evidence.

As an initial matter, an ALJ may proffer a variety of functional assumptions to a VE. *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). But testimony from a vocational expert cannot be relied upon to establish the existence of jobs in the national economy consistent with a claimant's residual functional capacity unless the question eliciting that testimony accurately references all of the claimant's physical and mental impairments. *Burns v. Barnhart*,

312 F.3d 113, 123 (3d Cir. 2002) ("the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.") (quoting *Podedworny*, 745 F.2d at 218). In other words, "[a] hypothetical question posed to a vocational expert 'must reflect *all* of a claimant's impairments.'" *Id.* (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987) (emphasis in original)).

The need to reference accurately all of the claimant's physical and mental impairments extends to the credibly established limitations stemming from a severe impairment. *Burns*, 312 F.3d at 123. An ALJ's mere use of a broad descriptive phrase that captures a general work setting or condition is inadequate where that phrase is not sufficiently descriptive of the claimant's credibly established limitations. *See id.* at 123-24 ("The phrase 'simple, routine, repetitive work' (or the similar phrase used in Burns' hypothetical) is not sufficiently descriptive of the previously noted deficiencies that Dr. Laviolette diagnosed. . . . Under these circumstances, once Dr. Laviolette's report detailing Burns' intellectual functioning limitations had been obtained, the ALJ should have held another hearing so that a complete hypothetical could have been posed to the vocational expert.").

Where a credibly established limitation is not included, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). In that event the vocational expert's testimony cannot supply the substantial evidence needed to uphold the ALJ's adverse decision. *Id.* at 550 ("If, however, an ALJ poses a hypothetical question to a vocational expert that fails to reflect 'all of a claimant's impairments that are supported by the record[,] . . . it cannot be considered substantial evidence.") (quoting *Chrupcala*, 829 F.2d at

1276); *see also id.* at 552 ("the hypothetical did not accurately convey all of [the plaintiff's] impairments, and the limitations they cause, and therefore the ALJ's decision is not supported by substantial evidence."); *Burns*, 312 F.3d at 123 ("Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence.") (citing *Podedworny*, 745 F.2d at 218 and *Wallace v. Secretary of Health & Human Servs.*, 722 F.2d 1150, 1155 (3d Cir.1983)).

The requirement that a hypothetical acutely portray all of a claimant's credibly established limitations is not to be taken out of context. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The ALJ is not required to submit a hypothetical that includes every impairment and corresponding limitation alleged by a claimant. *Id.* To the contrary, only those impairments that are medically established are required to be taken into account and in turn only those credibly established limitations from those impairments must be considered by the vocational expert. *Id.*

There are four principles that provide guidance about when a limitation is credibly established. First, limitations that are medically supported and otherwise uncontroverted in the record must be submitted for the VE's assessment. *Id.* ("Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response.") (citing *Burns*, 312 F.3d at 123). Second, limitations that are established by the medical evidence cannot be refuted by an ALJ substituting his own expertise. *Id.* ("Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence.") (citing *Plummer*, 186 F.3d at 429)). Third, limitations that are medically supported but contradicted by other evidence in the record may be credited or

discounted by the ALJ provided an explanation for the determination is given and the ALJ does not "reject evidence for no reason or for the wrong reason." *Id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) & Reg. § 929(c)(4)).

Finally, asserted limitations that lack objective medical support may be found to be credibly established. "In [this regard] the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it." *Id.* (citing Reg. § 929(c)(3)).

The medical evidence of record from the treating and consulting physicians unequivocally demonstrated significant motor dysfunction in the right leg caused by gross atrophy in an area of plaintiff's pelvis and in the calf region of the right leg, coupled with pain and numbness and loss of sensation in the right knee and foot, which in combination directly affected plaintiff's gait and ability to ambulate, balance, and lift his right foot. This evidence came from physicians who treated plaintiff or were consulting experts. There was no medical evidence that countered or undermined this body of evidence in any meaningful way. Thus, the ALJ was not at liberty to omit or discount the limitations flowing from this evidence in formulating plaintiff's RFCA.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008) (a treating physician's opinions may be entitled to great weight - considered

conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time."); *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987); *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217 18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. *Gordils v. Secretary of Health and Human Services*, 921 F.3d 327, 328 (1st Cir. 1990) (citing *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was the only medical assessment on point and corroborated by other evidence). Similarly, examining physicians' reports that rest on objective clinical test results may be entitled to significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Dr. DiCroce had been treating plaintiff for injuries sustained from a fall prior to February of 2010. He suspected an injury on the level of a "sacral fracture" and had already been prescribing significant pain medication and muscle relaxers for management of pain. Plaintiff fell again in June and in August Dr. DiCroce performed neurological testing that revealed right foot dysfunction in the form of an inability to dorsiflex the right foot and a persistent right foot

drop. Dr. Dicroce immediately recognized that testing by specialists in order to manage plaintiff's back pain and right foot drop was indicated.

Magnetic resonance imaging by Dr. Ramsey in August of 2010 revealed multiple areas of disc herniation and central and lateral recess spinal stenosis in multiple vertebra. The focal central spinal stenosis at L4-L5 was moderate to marked and there also was broad-based disc herniation and bilateral recess stenosis at this location. The testing essential revealed disease and impairment significant enough to be classified as a radiculopathy at the L4-L5 level of the spine.[6]

In September of 2010 Dr. Androkites conducted an electrodiagnostic evaluation to investigate plaintiff's reports of pain, loss of feeling in the right foot, and right leg numbness. Plaintiff presented with a history of constant right knee pain, numbness and tingling in the right

---

[6] Radiculopathy refers to a set of conditions in which one or more nerves is affected and does not work properly (a neuropathy). The emphasis is on the nerve root (radix = "root"). Wikipedia@ http://en.wikipedia.org/wiki/Radiculopathy. This can result in pain (radicular pain), weakness, numbness, or difficulty controlling specific muscles.

In a radiculopathy, the problem occurs at or near the root of the nerve, along the spine. However, the pain or other symptoms often radiate to the part of the body served by that nerve. For example, a nerve root impingement in the neck can produce pain and weakness in the forearm. Likewise, an impingement in the lower back or lumbar-sacral spine can be manifested with symptoms in the foot. *Id.*

When the pain radiates down the back of the leg to the calf or foot, it is described in lay terms as sciatica. Dr. Ari Ben-Yishay, MD, Spine-Health@ http://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy (last up-dated 4/25/12). This type of pain is often deep and steady, and can usually be reproduced with certain activities and positions, such as sitting or walking. *Id.*

Radicular pain usually follows the involved dermatome in the leg - the area of distribution of the leg covered by the specific nerve. When a nerve at the L4-5 or L5-S1 level is affected, this dermatome is usually the sciatic nerve, which runs down the back of each leg to the foot. *Id.*

The most common symptom of radicular pain is pain that radiates along the sciatic nerve - down the back of the thigh and calf into the foot. *Id.* Other symptoms include back pain that travels to the foot, numbness in the leg or foot, changes in sensation, and loss of reflexes. Anna Zemone Giorgi; George Krucik, MD, MBA, Healthline@ http://www.healthline.com/health/radiculopathy#Overview1.

foot, right leg weakness, right extremity weakness and lower back pain. These symptoms had been present for a considerable period of time. They were worsened by walking, sitting and standing.

Dr. Androkites reported that the test results were "abnormal" with 80 percent loss in the right common peroneal nerve, chronic neurogenic changes involving the right tibialis anterior and right peroneus muscles and sparing of the right flexor digitorum longus, right biceps short head, and right lumbosacral muscles.[7] The left tibialis anticus also was spared.

The entire results of the electrodiagnostic evaluation led Dr. Androkites to believe that plaintiff was suffering from right L5 radiculopathy of chronic duration. It also was Dr. Androkites' conclusion that the "systemic review" through this testing was "positive for [the limitations with which plaintiff presented]." R. 208.

Dr. Zorub examined plaintiff on September 20, 2010. At that juncture plaintiff had gross athropy of the right perinea and foreleg with complete foot drop on the right, plantar extensor weakness and sensory loss over the dorsum and outer areas of the right foot. In other words, plaintiff had gross shrinkage of portion of the pelvis occupied by urogenital passages and the rectum, bounded in front by the pubic arch, in the back by the coccyx, and laterally by part of the hipbone. The Free Dictionary by Farlex @ http://www.thefreedictionary.com/perinea. He also had gross athropy in the calf region and weakness in the right foot with associated numbness

---

[7] Common peroneal nerve dysfunction is damage to the peroneal nerve leading to loss of movement or sensation in the foot and leg. The peroneal nerve is a branch of the sciatic nerve, which supplies movement and sensation to the lower leg, foot and toes. Common peroneal nerve dysfunction is a type of peripheral neuropathy (damage to nerves outside the brain or spinal cord). Dysfunction of a single nerve, such as the common peroneal nerve, is called a mononeuropathy. Damage to the nerve destroys the myelin sheath that covers the axon (branch of the nerve cell). Or it may destroy the whole nerve cell. There is a loss of feeling, muscle control, muscle tone, and eventual loss of muscle mass because the nerves aren't stimulating the muscles. Medline Plus @ http://www.nlm.nih.gov/medlineplus/ency/article/000791.htm.

which escalated with activity.

It was this body of medical evidence that the ALJ was obligated to account for accurately in formulating plaintiff's RFCA. While there were plenty of normal findings in other areas and forms of testing, the above medical evidence of dysfunction and impairment was not contradicted in any meaningful way by this other medical evidence.

The RFCA rendered by the ALJ went well beyond the credibly established limitations from plaintiff's right lower extremity athropy and dysfunction. At least three of the activities included in the RFCA exceeded those limitations and encompassed work-related activities that plaintiff was unable to perform. Those activities were: limited holding of one position for 15 minutes; limited use of his right lower extremity for operation of foot controls; and occasional balancing, using ramps, and climbing stairs. Because the uncontroverted medical evidence demonstrated that plaintiff had right lower extremity dysfunction that required limitations that precluded these activities, reliance on the VE's response to the ALJ's hypothetical question is precluded. *Rutherford*, 399 F.3d at 554 (citing *Burns*, 312 F.3d at 123.

The ALJ's efforts to undermine the medical evidence of right leg and foot dysfunction through other evidence of record was not supported by substantial evidence and thus was error. First, the use of the notes authored by Dr. Zorub's assistant to suggest that plaintiff did not have the dysfunction confirmed by the diagnostic and clinical findings and verified radiological and electrodiagnostic testing was misplaced. Ms. Kolonich preformed a short pre-surgery consultation and only briefly physically examined plaintiff in that setting. She was not an acceptable medical source under the Commissioner's regulations and she did not perform any clinical or diagnostic testing. She was neither qualified nor informed from independent objective test results in a manner that would permit her to counter, undermine or discount the medical test

results and clinical findings rendered by Drs. DiCroce, Ramsey, Androkites and Zorub. Thus, her report indicating a limited examination, "at least partial foot drop," symmetrical lower strength in the lower extremities, lack of reflex responses perhaps due to plaintiff's lack of cooperation and an otherwise unremarkable medical status did not provide grounds for discounting the clinical and diagnostic test results verified by the treating and expert-consulting physicians.

Second, there was nothing in plaintiff's reports of daily living and social activities that was contrary to the diagnoses and confirmed limitations rendered pursuant to the examinations and diagnostic and clinical test results administered by the treating and expert-consulting physicians. To the contrary, plaintiff's accounts of these activities were in all material aspects consistent with and descriptive of the impairments and resulting limitations reported by plaintiff and documented in the medical records. They also were in accord with the general recognition that functional activities such as walking and sitting often increase the pain and dysfunction associated with lower lumber radiculopathy and related nerve impairments.

Third, the ALJ's reasoning - that because there had not been frequent changes in plaintiff's medications or dosage adjustments, plaintiff's impairments and limitations necessarily did not have the degree of significant limitation claimed by plaintiff - smacks of rank medical speculation. Of course, the ability to control a limitation with medication or treatment is a factor which the ALJ may consider in assessing the severity of an impairment. *Welch v. Heckler*, 808 F.2d 264 (3d Cir. 1986). And it equally is well accepted that if a condition can be controlled with medication or treatment, it is not disabling under the Act. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993); *see also* 20 C.F.R. §404.1530(b).

There was no evidence in the medical records to support the proposition that plaintiff's impairments and resulting limitations were controlled by the prescribed medication to a degree that would permit a level of activity consistent with the RFCA. To the contrary, every examining and consulting physician noted without reservation the long-standing limitation in functional activities reported by plaintiff and Dr. Androkites actually reported the electrodiagnostic evaluation confirmed those limitations.

While it is not expected that the ALJ's explanation match the rigor of the "medical or scientific analysis" a medical professional might provide in justifying his or her decisions, when rejecting a treating or consulting physician's findings or according such findings less weight, the ALJ must be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. While the explanation need not reference every relevant treatment note in a voluminous medical record, the ALJ, as the factfinder, should consider and evaluate the medical evidence thoroughly. *Id.* In doing so the ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). Nor can he "substitute his lay opinion for the medical opinion of experts," or engage in "pure speculation" unsupported by the record. *Id.* at 318-19; *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).

Here, plaintiff was prescribed pain medication four times daily coupled with two daily doses of muscle relaxers. He was not attempting to work or perform the rigors of activity equivalent to substantial gainful activity at the time. He repeatedly relayed that activities such as

walking, sitting and standing worsened his symptoms. To posit that that the stability in treating plaintiff's pain and limitations with pain medication and muscle relaxers necessarily raised the inference that plaintiff's lower back radiculopathy and resulting right extremity dysfunction did not have significant impact on plaintiff's ability to do work-related activities with his right extremity - such as using stairs periodically, balancing and using foot controls - is a medical opinion extrapolated from the import of the medical evidence of treatment. While an ALJ does have some leeway in interpreting the import of the medical evidence of record, here the rendering of a medical opinion based on the lack of change in the various forms of medical treatment merely pits the ALJ's medical assessment against those of the informed physicians. Such a medical opinion substitutes the lay opinion of the ALJ for that of the treating and consulting physicians and such *a priori* reasoning cannot supply the substantial evidence needed to displace the import of the impairments and resulting limitations established by the clinical and diagnostic medical findings of the treating and consulting expert physicians. *See Morales*, 225 F.3d at 317.

The same is true with regard to the ALJ's reasoning that the lack of more aggressive forms of treatment for pain management such as attending a pain management clinic or physical therapy indicated plaintiff's limitations were not as inhibiting as the medical evidence and plaintiff's testimony suggested. No physician referred plaintiff to a pain management clinic or prescribed physical therapy, nor did any prescribe the use of a Tens unit, a back brace or a cane. To draw the inference that plaintiff's decision not to pursue these forms of treatment demonstrates that his limitations were not significantly restricting was rank speculation based on nothing more than conjecture predicated on the scope of the medical evidence.[8]

---

[8] The ALJ's reliance on plaintiff's decision to forego back surgery lacks significant probative

Finally, as previously noted, plaintiff's submissions and testimony concerning his activities of daily living and social functioning did not contain any affirmative ground or sound basis to support a finding that plaintiff could meet the demands of the RFCA as they related to the use of his right extremity for climbing stairs, balancing and use of leg controls. To the contrary, there was nothing in that body of evidence that even remotely suggested plaintiff could meet such demands on a sustained basis that would be equivalent to working 40 hours a week for 52 weeks a year.

Failure to render a RFCA that accounted for all of the credibly established limitations produced by plaintiff's lower back impairment and right lower extremity dysfunction precludes reliance on the VE's expert testimony, resulting in the need vacate the decision below and remand for further proceedings. But a second area of the record raises serious grounds for questioning the ALJ's assessments and conclusions. We take this opportunity to address that area at this juncture because it is sure to arise on remand and the governing standards are well developed by the United States Court of Appeals for the Third Circuit.

The Act recognizes that under certain circumstances the subjective reporting of pain and related limitations may in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall alone not be conclusive evidence of disability ...; there must be medical signs and findings, established by medically acceptable

---

force for similar reasons. To be sure, the ALJ was entitled to draw a negative inference about the degree, duration and intensity of plaintiff's pain and dysfunction from plaintiff's decision not to pursue back surgery. But there are many attendant risks to undergoing such surgery, *see e.g.* Complications of Spine Surgery, University of Maryland Medical Center @ http://umm.edu/programs/spine/health/guides/complications-of-spine-surgery, including the number of back surgeries that do not produce long-term resolution of the underlying pain and dysfunction. Of course, the Act does not mandate that a claimant exhaust all potential forms of treatment without regard to such risks and potential adverse consequences. And these risks undermine the probative force of the inference that plaintiff did not suffer from significant pain and dysfunction that was exacerbated after engaging in functional activities.

clinical or laboratory diagnostic techniques, which show the
existence of a medical impairment that result from anatomical,
physiological or psychological abnormalities which could
reasonably be expected to produce the pain or other symptoms
alleged and which, when considered with all evidence
required to be furnished under this paragraph (including
statements of the individual or his physician as to the
intensity and persistence of such pain or other symptoms
which may reasonably be accepted as consistent with
the medical signs and findings), would lead to a
conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984). The United

States Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by

district courts when reviewing assessments of the Commissioner based on subjective reports of

significant pain and resulting limitations: (1) subjective complaints are to be seriously

considered, even where not fully confirmed by objective medical evidence; (2) subjective

complaints may support a claim for disability benefits and may be disabling; (3) when such

complaints are supported by medical evidence, they should be given great weight; and finally,

(4) where the claimant's testimony about the reported limitation is reasonably supported by

medical evidence, the ALJ may not discount the limitation without contrary medical evidence.

*Ferguson v. Schweiker*, 765 F.2d 31 (3d Cir. 1985).

    In evaluating such limitations, an ALJ must accord subjective complaints the same

treatment as objective medical reports, in that he must weigh all the evidence before him and

explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner

of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be

given to subjective complaints where a medical condition exists that could reasonably produce

such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical

evidence provides objective support for the subjective complaint, the ALJ can only reject such a

complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)).

In his decision, the ALJ glossed over Plaintiff's subjective complaints of pain and resulting limitation, summarily rejecting them merely by citing to a physician assistant's brief report for a pre-operative physical review and generalizations drawn from plaintiff's own statements regarding his activities of daily living and social activities. The ALJ further attempted to discount plaintiff's description of his pain and limitations by opining about the lack of treatment that was never prescribed or otherwise recommended to plaintiff by his treating and consulting physicians and placing undue weight on plaintiff's decision on to undergo back surgery. The entire assessment was based on little more than unwarranted extrapolations and generalizations from plaintiff's benign account of his daily activities and a pseudo medical opinion about the lack of certain medical evidence and prescribed courses of treatment.

Yet the record contained medical evidence of numerous impairments that are known to cause the pain and limitations claimed by plaintiff. These included radiculopathy at L4-L5, multiple areas of disc herniation and central and lateral recess spinal stenosis in multiple vertebra. Each of these impairments was verified by clinical and diagnostic testing and are known to cause pain and dysfunction on the level claimed by plaintiff. Each of the treating and

consulting physicians acknowledged plaintiff's subjective reports of pain and limitation and did not question or otherwise doubt them. Dr. Androkites indicated that clinical testing was positive for such claimed limitations. Thus, there was medical evidence that objectively supported plaintiff's subjective complaints and the ALJ had the discretion to reject such a complaints by referencing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. The record did not contain such evidence and the ALJ was not at liberty to interpose his own medical opinions to counter the import of the existing medical evidence.

The same is true with regard to plaintiff's right lower extremity dysfunction. The was medical evidence establishing the existence of a radiculopathy extending into the sciatic and peroneal nerves, which impairment is known to cause pain and loss of sensation in the leg and foot. It also is known to be exacerbated by functional activities such as walking, sitting and standing. Plaintiff had a record of repeat falling that developed into a complete right foot drop. His motor dysfunction adversely affected his gait and station. He had gross athropy of the right perinea and foreleg with complete foot drop on the right, plantar extensor weakness and sensory loss over the dorsum and outer areas of the right foot. He had the lack of knee and ankle jerk responses. In other words, in addition to the clinical and diagnostic test results the medical evidence generated from physical examination by expert physicians repeatedly produced findings that supported plaintiff's accounts concerning the persistence, intensity and duration of the pain and dysfunction claimed by plaintiff.

It is against this backdrop that the ALJ must assess plaintiff's testimony about the limitations produced from his impairments during the insured period. The testing and diagnostic medical findings and test results clearly established limitations that were known and expected to establish the pain and limitations reported by plaintiff. There was no contrary medical evidence.

Assessments of plaintiff's pain and limitations under the Third Circuit's controlling standards noted above are entitled to great weight and cannot be discounted in the absence of contrary medical evidence.[9]

## IV.   CONCLUSION

The ALJ clearly omitted limitations from plaintiff's residual functional capacity assessment that were credibly established during the insured period by uncontradicted medical evidence.  The ALJ likewise failed to assess plaintiff's complains of pain and limitations in accordance with the Third Circuit's controlling standards.  As a result, the administrative decision under review is not "supported by substantial evidence" for purposes of § 405(g).  A remand for further administrative proceedings is required.

For the reasons set forth above, plaintiff's motion for summary judgment will be granted to the extent it seeks to have the decision of the Commissioner vacated and the matter remanded for further proceedings consistent with this opinion, the Commissioner's motion for summary judgment will be denied and final judgment will be entered in favor of plaintiff and against the Commissioner.  Appropriate orders will follow.

Date:  September 10, 2014


s/David Stewart Cercone
David Stewart Cercone
United States District Judge


cc:     E. David Harr, Esquire
        Colin Callahan, AUSA

        (*Via CM/ECF Electronic Mail*)

---

[9] Of course, those standards derive from the Third Circuit's interpretation of the Act.